UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/17/17

TAUPITA INVESTMENT, LTD.,
a Bahamian entity, SEGUE CORPORATION, a
Bahamian entity, URBACON BUILDINGS GROUP
CORP., a Bahamian entity, and STEVEN
MACKEY, a Bahamian individual,

                                 Plaintiffs,

                         -v-

BENNY PING WING LEUNG, an individual, and
FIRST TORONTO REALTY CORP., a Delaware
Corporation,

                                 Defendants.

14 Civ. 9739 (PAE)

OPINION & ORDER

------------------------------------------------------------------X

BENNY PING WING LEUNG and FIRST
TORONTO REALTY CORP.,

                          Third-Party Plaintiffs,

                         -v-

EFG BANK & TRUST (BAHAMAS) LTD.,

                        Third-Party Defendant.

------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiffs Taupita Investments, Ltd. ("Taupita"), Segue Corporation ("Segue"), Urbacon

Buildings Group Corp. ("Urbacon"), and Steven Mackey bring this diversity action against

Defendants Benny Ping Wing Leung and First Toronto Realty Co. ("First Toronto"), alleging

that defendants defrauded them out of a combined $2.3 million in connection with purported

investments a 36-story office and retail tower known as "Titan Tower" being built in Ningbo,

China (the "Project"). Plaintiffs bring state law claims of fraud in the inducement, fraud, and

conversion against Leung, and state law claims of aiding and abetting fraud and conversion against First Toronto. Defendants counterclaim, demanding that plaintiffs pay their legal fees. Defendants also bring third-party claims against EFG Bank & Trust ("EFG"), the Bahamian bank that served both parties throughout the relevant transactions.

Three motions are pending. First, plaintiffs move to dismiss defendants' counterclaims. Second, EFG moves to dismiss defendants' third-party claims. Third, defendants move to strike plaintiffs' jury trial request. For the reasons that follow, the Court (1) grants plaintiffs' motion to dismiss defendants' counterclaims; (2) grants EFG's motion to dismiss defendants' third-party claims; and (3) denies the motion to strike plaintiffs' jury trial demand.

## I.    Background

### A.    Factual Background[1]

At the core of this action is plaintiffs' claim that defendants defrauded them of millions of dollars through a series of false statements that caused plaintiffs to invest in the Project and that lulled plaintiffs from seeking return on their money. Among the ways plaintiffs claim that defendants misused their money was by compensating an earlier group of defrauded investors.

#### 1.    The Parties

Plaintiffs allege that they are holders of promissory notes issued, by entities controlled by Leung, in connection with a real estate investment in China. SAC ¶¶ 3–5. Taupita, Segue, and

---

[1] The facts are drawn from the Second Amended Complaint, Dkt. 43 ("SAC") and attached exhibits; defendants' answer, Dkt. 49 at 1–19 ("Answer"); defendants' counterclaims, Dkt. 49 at 19–22 ("Counterclaims"); and defendants' amended third-party complaint, Dkt. 94 ("ATPC"). For the purposes of resolving the motions to dismiss defendants' counterclaims and third-party claims, the Court considers all well-pleaded facts found in the Counterclaims and ATPC to be true, drawing all reasonable inferences in defendants' favor. *See Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir. 2012).

Urbacon are Bahamian corporations. *Id.* Mackey was managing director of third-party

defendant EFG in 2009 and 2010. ATPC ¶ 12.

Third-party defendant EFG is a private bank chartered in the Bahamas. SAC ¶ 15. It is

the Bahamian branch of EFG International, a Switzerland-based private banking group. ATPC

¶ 8.

Defendant Leung is a resident of Brookville, New York, and the president and director of

Cathexis Holdings, a Cayman Islands corporation. Answer ¶ 7. Defendant First Toronto is a

Delaware corporation owned 100% by Cathexis; Leung is the "beneficial owner" of First

Toronto. SAC ¶ 7.

### 2.  Bridge Loan Investors

In 2008, Leung informed potential investors that he had an investment opportunity in the

Project. Answer ¶ 9. The SAC alleges that, in so doing, Leung "represented that he and his

family had a fund containing in excess of $400 million . . . which he was going to use to buy

properties and help[] fund development projects in Asia including the Project in Ningbo." SAC

¶ 9.

In September 2008, several investors (the "Bridge Loan Investors") entered into Note

Purchase Agreements ("NPAs"), Answer ¶ 10, that Leung allegedly prepared and executed in his

capacity as president of an entity called First Toronto Partners, Ltd., SAC ¶ 11. Under the

NPAs, the Bridge Loan Investors agreed to purchase promissory notes from FT Asia Partners,

L.P., in exchange for a $3,625,000 bridge loan. Answer ¶ 10. The SAC alleges that these

promissory notes were guaranteed by First Toronto Sirius Fund, LP, another entity controlled by

Leung, and were to bear 20% interest per annum with interest payments due monthly and the

principal due in full in March 2010. SAC ¶ 12.

The SAC alleges that Leung did not make required interest payments to the Bridge Loan Investors for the first eight months after executing the notes, and that, despite one payment in May 2009 amid threats of litigation from the Bridge Loan Investors, substantial interest is still outstanding. SAC ¶ 12. The parties agree that, by June 2010, the $3,625,000 in principal was paid. Answer ¶ 10; SAC ¶¶ 33–35. The SAC alleges that the funds necessary for the Bridge Loan Investors' repayment came from plaintiffs' 2010 investments with Leung in connection with the Project, discussed further below. SAC ¶¶ 33–35. Defendants deny this allegation. Answer ¶ 27.

### 3. Leung's Initial Representations to EFG

Leung-controlled entities Cathexis and Sirius V Asia Partners Limited ("Sirius") had depository bank accounts with EFG. *Id.* ¶ 49; ATPC ¶ 9. Defendants allege that EFG originally approached Leung and advised him as an officer of Cathexis and Sirius that EFG's account holders had an appetite for high-yield investment opportunities. ATPC ¶ 10.

In late 2009, Leung advised EFG of the opportunity for its account holders to invest in the Project. Answer ¶ 49; SAC ¶ 15. In early 2010, Leung made an in-person pitch at EFG's Bahamas office. Answer ¶ 13; SAC ¶ 15.

Leung sought a $4 million investment that he represented as a chance to purchase a friend's limited partnership interest in the Project. Answer ¶ 15; SAC ¶ 18. The SAC alleges that Leung made several representations regarding the Project that EFG then conveyed to its clients, including: that Leung and his family, through various entities, owned all title and interest in the Project; that construction was underway and the Project was well-capitalized with funds of $60 million, half of which came from Leung or his family and the other half from a major Chinese bank; that the Project was valued at $120 million; that once the $4 million was raised no

further funds would be needed to complete the Project; and that potential investors would have priority over all previous investors but the Chinese bank. SAC ¶¶ 16–21. Leung did not mention the Bridge Loan Investors. *Id.* ¶ 18.

Defendants allege that, after Leung's pitch in the Bahamas, EFG proposed to act in "dual capacities" for potential future transactions: as investment advisor for its customers and as note placement agent for Cathexis. ATPC ¶ 12. EFG and Cathexis did not execute a formal written note placement agreement. *Id.* ¶ 14. Instead, defendants claim that the terms of the alleged note placement agreement are set out in a series of emails as well as in the provisions of later agreements between Cathexis and EFG's clients. *Id.* Defendants allege that EFG and Cathexis agreed that EFG would receive a 3% placement fee of $112,500 for its services. *Id.*

### 4. Segue, Urbacon, and Mackey Investments

The SAC alleges that several of EFG's clients, including Segue, Urbacon, and Mackey, decided to make an investment in the Project based on Leung's representations, as conveyed to investors by EFG. SAC ¶¶ 23–24. All told, EFG's clients invested a total of $3.75 million.[2] *Id.* ¶ 25. Leung allegedly represented that a family friend would cover the remaining $250,000 necessary to complete the Project. *Id.* ¶ 24. Between February and April 2010, Leung—acting in his capacity as president of Cathexis—prepared and executed NPAs between Cathexis and Segue, Urbacon, and Mackey. *Id.* ¶ 25. The NPAs required Segue, Urbacon, and Mackey to purchase promissory notes from Cathexis, under which Cathexis agreed to repay the principal plus 15% interest within two years. *Id.* Plaintiffs' promissory notes, also signed by Leung, were executed on the same day as the relevant NPAs. *See id.* Ex. D–F ("Note Purchase Agreements"),

---

[2] As alleged, Segue invested $250,000; Urbacon invested $350,000; Mackey invested $200,000; and Taupita's predecessors in interest (four noteholders not named in the SAC) invested $1.5 million collectively. *Id.* ¶ 25.

G–K ("Promissory Notes"). They were guaranteed by Sirius, another entity allegedly controlled by Leung, pursuant to guaranty agreements signed by Leung on behalf of Sirius. *Id.* ¶¶ 27–28 & Ex. L–N ("Guaranty Agreements"). The promissory notes provided that each was "one of a series identical in terms and conditions . . . in the aggregate principal amount of Four Million Dollars." Promissory Notes. Each NPA stated that the principal would be used by Cathexis to acquire stock in a holding company that owned 100% of title and interest in the Project. *See* Note Purchase Agreements. The Guaranty Agreements stated that Cathexis had no other assets. *See* Guaranty Agreements.

### 4. Assignment to Taupita

Taupita was not among the original EFG client investors in the Project. *See* SAC ¶ 29. Taupita does not hold a promissory note in its name, nor did it execute a NPA with Cathexis. Counterclaims ¶¶ 71–73. Instead, the SAC alleges that Taupita was assigned the rights and interests of four original noteholders who had altogether loaned Cathexis $1.5 million. SAC ¶ 26 nn.2, 29. Between February and April 2010, around the same time as Segue, Urbacon, and Mackey made their investments, these four original investors were issued their promissory notes. *Id.* ¶ 26 n.2. Those promissory notes were then purchased by another investor, Lawrence Wosskow, who, on October 3, 2011, was issued a new promissory note from Cathexis. *Id.*; Answer ¶¶ 22–24. Wosskow then allegedly assigned his interest to Taupita with Leung's consent. *Id.* ¶ 29 & Ex. O ("Consent Form"). On November 11, 2013, Leung signed the consent-to-transfer form. *See* Consent Form.

Defendants allege that Taupita is an affiliate of EFG and that EFG provided the funds for purchasing Wosskow's position. Answer ¶ 21; ATPC ¶ 13. Defendants further claim that in

November 2013, EFG advised Leung that it, not Taupita, intended to acquire Wosskow's promissory note. ATPC ¶ 13.

Defendants also claim that Cathexis did not give effective consent to the transfer of the rights under the promissory note to Taupita, as required by the terms of the NPAs. *See* Note Purchase Agreements. The consent-to-transfer form signed by Leung states that Cathexis consented to the transfer "subject to . . . conditions" including (1) receipt of the original promissory note issued to Wosskow and (2) receipt of an opinion of counsel stating that the promissory note was not subject to registration requirements. (Such an opinion was also required by the NPAs.) SAC, Ex. O ("Consent to Transfer"). The consent form states that, upon receiving these documents, Cathexis would cancel Wosskow's promissory note and issue a new promissory note with identical terms to Taupita. *Id.* Defendants claim that Cathexis never received Wosskow's promissory note or any opinion of counsel, and that Cathexis never re-issued a note in Taupita's name. Answer ¶ 24. Defendants further allege that Cathexis delivered the consent form to EFG, and that Taupita's name on the form as "Transferee" was not filled in by Cathexis. *Id.*

### 5. Delayed Payment and Nonpayment of Interest

The SAC alleges that defendants did not make timely interest payments to plaintiffs, continually providing excuses for failing to do so.

Leung did not make the first interest payments to plaintiffs by their due date of April 2011. SAC ¶ 37. In May 2011, Leung advised EFG that a devastating fire in Shanghai had prompted Chinese authorities to require additional safety inspections before issuing "Certificates of Occupancy" ("CO") for new buildings. *Id.*

On July 18, 2011, Leung allegedly advised EFG that without the CO, the Project could not close on pre-sold office units in the building and Leung would not have the funds to repay investors. *Id.* ¶ 38 & Ex. Q. On August 3, 2011, Leung wrote EFG representing that the fire inspection issue had been resolved. *Id.* ¶ 39 & Ex. R. Later that month, Leung made the first and only interest payments due under the promissory notes. *Id.* ¶ 40. The payments were four months late. At EFG's request, Leung provided an update on October 26, 2011, in which he assured EFG's clients that all problems had been resolved. *Id.* ¶ 41.

The second interest payment and payment of the full principal was due in April 2012. *Id.* ¶ 43. That month, Leung allegedly advised EFG that payment would not be forthcoming because the Chinese authorities had unexpectedly delayed certain approvals. *Id.* Leung characterized the delay as minor and requested that plaintiffs extend the deadline for payment until December 31, 2012, at which point they would receive additional interest. *Id.* Plaintiffs agreed and executed amendments to their promissory notes. *Id.* ¶ 44. On October 3, 2011, Leung responded to EFG's request for an update with news of certification problems regarding the building's ventilation system. *Id.* ¶ 45 & Ex. U. Such problems he indicated were holding up issuance of the Project's "Certificate of Fitness" ("CF"). *Id.* On December 4, 2011, Leung wrote in an email to EFG that the problems had been resolved and there remained "nothing to prevent the securing of the CF." *Id.* ¶ 46.

Five days later, Leung allegedly changed course, advising EFG that an additional $5 million investment was required to secure the CF. *Id.* ¶ 47. Leung explained that a fire remediation contractor now held an outstanding $5 million lien on the Project, which prevented the issuance of a CF. *Id.* ¶ 47. EFG advised Leung that its clients would consider no such investments without supporting evidence. *Id.* ¶ 48. Plaintiffs and the Bridge Loan investors did

not make any further investments, *id.* ¶ 49, and Leung did not make any interest or principal payments by the amended maturity date of December 31, 2012, *id.* ¶ 50.

On April 3, 2013, Leung allegedly notified EFG that Cathexis had received a $3.5 million loan, and that only $1.5 million more was needed from EFG's clients to pay off the lien. *Id.* ¶ 51. Leung provided some documentation relevant to the project, but nothing that specifically verified the existence of the lien or the requirement that a CF be granted in order to close sales on units. *Id.* ¶ 54. Without such support, plaintiffs again refused to provide the additional funds. On June 11, 2013, Leung again requested $1.5 million. *Id.* ¶ 55. He also asked for a six-month extension of the payment due dates, to which plaintiffs eventually agreed by way of another amendment to their promissory notes, dated July 29, 2013. *Id.* ¶¶ 56–57. The due date for full payment was now December 31, 2013. *Id.* On November 12, 2013, plaintiffs allege that they met with Leung at EFG's Bahamas office. *Id.* ¶ 58. Leung reduced his ask to $1 million, but still did not provide the documentation plaintiffs sought. *Id.* The December 31, 2013 extension date passed with no additional payments made. *Id.* ¶ 61. The promissory notes were then, and still are, in default. *Id.* ¶ 67.

Defendants deny, largely without elaboration, the SAC's allegations regarding payment delays and associated communications. *See* Answer ¶¶ 31–40, 42–48. However, defendants do acknowledge that letters from Leung about the purported delays, which are cited in the FAC, "are communications sent to EFG." *Id.* ¶¶ 31–32, 36–38. Defendants also admit that the 2011 interest payment was not made when due, *id.* ¶ 30, and that the 2012 interest payment was not made at all, *id.* ¶ 41. Defendants concede that "no payments of interest on the Notes have been made since 2011 and no payments of principal made and no further extensions of the maturity of the Notes extended beyond December 31, 2013." *Id.* ¶ 55.

### 6. Investigation by Chinese Law Firm

On January 16, 2014, the SAC alleges, Leung represented that he needed $500,000 to pay off the lien. *Id.* ¶ 62. Distrustful of Leung, plaintiffs declined to invest. *Id.* Around the same time, EFG and plaintiffs hired a Chinese law firm to investigate Leung's claims. *Id.* ¶ 65. Plaintiffs allege that the investigation established that construction on the Project had ended in December 2010; that there is no such thing as a "Certificate of Fitness" in China; that the Project had already received all approvals and certifications necessary for sale of units; and that all Project units available for sale had been sold by 2012 with funds paid to the building owners. *Id.* Defendants deny that the investigation could have established such facts. Answer ¶ 53.

### 7. Purported Subordination of Payments to Investors

On September 8, 2014, Leung wrote EFG to say that a third party had stepped in to pay off the lien. SAC ¶ 69. Leung also claimed that several building contractors were now demanding immediate payment. *Id.* As a result, Leung claimed, plaintiffs' interests had been subordinated to the payment made by this unidentified third party and to the claims of these contractors. *Id.* The SAC alleges that "without directly stating it, [Leung] advised [plaintiffs] that due to their position, it is unlikely they would ever receive payment." *Id.*

Plaintiffs allege that their money was in fact never invested in the Project. *Id.* ¶ 99. Instead, Leung and First Toronto converted the funds to their own use or for an improper purpose. *Id.* Specifically, plaintiffs allege that Leung used their investment to pay the Bridge Loan Investors back their principal rather than capitalize the Project. *Id.* ¶ 33. Plaintiffs allege that, on multiple occasions in 2010, Leung made payments to the Bridge Loan Investors days after receiving funds from EFG's clients. *Id.*

### B. Procedural History

On December 10, 2014, Taupita and Segue filed the original complaint in this action. Dkt. 1. On March 13, 2015, defendants filed a motion to dismiss the complaint, Dkt. 23, as well as a supporting memorandum of law, Dkt. 26, a declaration by Leung, Dkt. 25, and an affirmation of David M. Olasov, Dkt. 24. On April 1, 2015, Taupita and Segue filed a memorandum of law in opposition to the motion to dismiss. Dkt. 27. Also on April 1, 2015, Taupita and Segue filed a motion to strike the declaration of Leung, Dkt. 29, and a supporting memorandum of law, Dkt. 30. On April 6, 2015, the Court denied the motion to strike. Dkt. 32. On April 8, 2015, defendants filed a reply memorandum of law in support of their motion to dismiss. Dkt. 33.

On February 9, 2016, the Court granted Taupita and Segue leave to amend the complaint. Dkt. 34. On February 12, 2016, Taupita and Segue filed their first amended complaint (the "FAC") which added Urbacon and Mackey as plaintiffs. Dkt. 35. On February 19, 2016, the parties entered into a stipulation that defendants' pending motion to dismiss the complaint would be treated as applying to the FAC. Dkt. 36.

On July 11, 2016, plaintiffs filed their second amended complaint ("SAC"), along with attached exhibits. Dkt. 43. The SAC alleged fraud in the inducement, fraud, and conversion and demanded damages in excess of the $2.3 million in principal owed on the Notes. *Id.*

On August 1, 2016, defendants answered. Dkt. 49 ¶¶ 1–90 ("Answer"). In the same filing, defendants counterclaimed against all four plaintiffs. Dkt. 49 ¶¶ 1–15 ("Counterclaims"). Also on August 1, 2016, defendants filed a third-party complaint against EFG. Dkt. 49-2.

On October 5, 2016, plaintiffs filed a motion to dismiss the counterclaims, Dkt. 72, as well as a memorandum of law in support, Dkt. 73 ("Pl. Br. Counterclaims"). On October 19,

2016, defendants filed a memorandum of law in opposition. Dkt. 77 ("Def. Br. Counterclaims"). On October 26, 2016, plaintiffs filed a reply. Dkt. 79 ("Pl. Reply Counterclaims").

On November 18, 2016, EFG filed a motion to dismiss the third-party complaint, Dkt. 87, as well as a supporting memorandum of law, Dkt. 88.

On November 21, 2016, defendants moved to strike plaintiffs' jury trial demand. Dkt. 89. On November 22, 2016, defendants filed a memorandum of law in support of the motion to strike, Dkt. 91 ("Def. Br. Strike"), and a supporting affirmation, Dkt. 92. On December 8, 2016, Plaintiffs filed a memorandum of law in opposition to that motion. Dkt. 93 ("Pl. Br. Strike").

On December 9, 2016, defendants filed an amended third-party complaint against EFG. Dkt. 94 ("ATPC").

On December 19, 2016, defendants filed a reply in support of the motion to strike. Dkt. 95 ("Def. Reply Strike").

On December 23, 2016, EFG filed a motion to dismiss the ATPC, Dkt. 97, along with a supporting memorandum of law, Dkt. 98 ("EFG Br."). On January 13, 2017, defendants filed a memorandum of law in opposition to the motion to dismiss the ATPC. Dkt. 100 ("Def. Br. Implead"). On January 27, 2017, EFG filed a reply in support of that motion. Dkt. 105 ("EFG Reply").

On June 15, 2017, the Court heard argument on the three pending motions.

## II. Applicable Legal Standards

### A. Motions to Dismiss Third-Party Complaint and Counterclaims

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)) (internal quotation marks omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*).

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." *Orientview Techs. LLC v. Seven For All Mankind, LLC*, No. 13 Civ. 0538 (PAE), 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013) (quoting *Revonate Mfg., LLC v. Acer Am. Corp.*, No. 12 Civ. 6017 (KBF), 2013 WL 342922, at *2 (S.D.N.Y. Jan.18, 2013)).

## B.     Motion to Strike Jury Trial Demand

When asserted in federal court, the right to a jury trial is governed by federal law. *See Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 188 (2d Cir. 2007). "Since the right of jury trial is fundamental, courts indulge every reasonable presumption against waiver."

*Adelphia Recovery Trust v. Bank of Am., N.A.*, No. 05 Civ. 9050 (LMM), 2009 WL 2031855, at

*7 (S.D.N.Y. July 8, 2009). Nonetheless, a contractual waiver is enforceable if made knowingly,

intentionally, and voluntarily. *Merrill Lynch*, 500 F.3d at 188. In considering whether the

waiver of a right to a jury trial was knowing and voluntary, courts must consider: "1) the

negotiability of contract terms and negotiations between the parties concerning the waiver

provision; 2) the conspicuousness of the waiver provision in the contract; 3) the relative

bargaining power of the parties; and 4) the business acumen of the party opposing the waiver."

*Morgan Guar. Trust Co. of N.Y. v. Crane*, 36 F. Supp. 2d 602, 603–04 (S.D.N.Y. 1999) (citation

omitted). "The burden of proving that a waiver was knowing and intentional rests with the party

attempting to enforce the purported waiver." *Lehman Bros. Holdings Inc. v. Bethany Holdings*

*Grp., LLC*, 801 F. Supp. 2d 224, 229 (S.D.N.Y. 2011) (citation omitted).

## III.  Discussion

As noted, three motions are pending: plaintiffs' motion to dismiss defendants'

counterclaims, EFG's motion to dismiss the ATPC, and defendants' motion to strike plaintiffs'

jury trial demand. The Court addresses each motion in turn.

### A.  Plaintiffs' Motion to Dismiss Defendants' Counterclaims

Defendants' counterclaims seek the fees and costs incurred in defending this action. In

the first, brought against Taupita alone, defendants assert that they are entitled to fees and costs

because Taupita has asserted claims that it lacks "standing" to assert. Counterclaims ¶¶ 2–3.

Defendants further claim that, even if Taupita has the right to sue under the promissory notes,

defendants are entitled to fees and costs to the extent incurred defending claims brought by

Taupita based on facts preceding the effective date of Taupita's acquisition of Wosskow's

interest. *Id.* ¶ 4. In the second counterclaim, brought against all plaintiffs, defendants allege a

breach of the contractual covenant not to sue found in the NPAs that plaintiffs signed in connection with their investments. *Id.* ¶¶ 5–7. Defendants rely on Paragraph 5(a) of each NPA, which reads as follows:

> Limited Recourse. The enforceability against the Company [Cathexis] of the obligations of the Company under this Agreement and the Note shall be limited to the tangible or intangible assets of the Company, and the Purchaser expressly agrees for itself, its successors and assigns that it shall have no right and shall take no action against any partner of the Company or any employee, officer, director, or shareholder of any of them in relation to this Agreement or the Note; provided, however, that nothing herein shall limit or waive any right the Purchaser may have against Guarantor under the Guaranty Agreement.

Note Purchase Agreements at 6.[3] In opposing plaintiffs' motion to dismiss the counterclaims, defendants also argue that plaintiffs have violated their contractual obligation to recover only against the "tangible and intangible assets" held by Cathexis. Def. Br. Counterclaims at 9.

As discussed below, the Court grants the motion to dismiss both counterclaims for two reasons: because (1) the "American Rule" regarding litigation fees and expenses prohibits both counterclaims, and (2) defendants' allegations of a breach of a covenant not to sue do not support recovery of litigation expenses.

## 1.    The American Rule

"Our legal system generally requires each party to bear his own litigation expenses, including attorney's fees, regardless whether he wins or loses." *Fox v. Vice*, 563 U.S. 826, 832 (2011). "New York follows the 'American Rule,'" which provides "that 'attorneys' fees and disbursements are incidents of litigation and the prevailing party may not collect them from the

---

[3] In opposing the motion to dismiss the counterclaims, defendants also point to functionally identical covenants found in the text of the relevant promissory notes. Def. Br. Counterclaims at 3. These Notes were executed between Cathexis and plaintiffs. It is not clear that defendants properly pled the existence of these separate covenants in their answer or their counterclaims. The Court need not resolve this issue, however, because its analysis of the covenants found in the NPAs applies equally to the covenants in the Notes.

loser unless an award is authorized by agreement between the parties or by statute or court rule.'" *Versatile Housewares & Gardening Sys., Inc. v. Thill Logistics, Inc.*, 819 F. Supp. 2d 230, 241 (S.D.N.Y. 2011) (quoting *A.G. Ship Maintenance Corp. v. Lezak*, 69 N.Y.2d 1 (1986)); *see Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003); *Ancile Inv. Co. v. Archer Daniels Midland Co.*, 992 F. Supp. 2d 316, 318–19 (S.D.N.Y. 2014); *Mighty Midgets, Inc. v. Centennial Ins. Co.*, 389 N.E.2d 1080 (N.Y. 1979). "This policy 'provides freer and more equal access to the courts . . . [and] promotes democratic and libertarian principles.'" *Oscar Gruss & Son, Inc.*, 337 F.3d at 199 (quoting *Mighty Midgets, Inc.*, 389 N.E.2d at 1085) (alteration in *Oscar Gruss & Son, Inc.*); *see A.G. Ship Maint. Corp.*, 69 N.Y.2d at 5 ("The [American] rule is based upon the high priority accorded free access to the courts and a desire to avoid placing barriers in the way of those desiring judicial redress of wrongs.").

New York courts have recognized limited exceptions to the American Rule, including where fees and expenses "'result[] from frivolous conduct' in civil litigation." *Versatile Housewares & Gardening Sys., Inc.*, 819 F. Supp. 2d at 242 (quoting N.Y. Comp. Codes R. & Regs. tit. 22, § 130–1.1(a)). "Conduct is 'frivolous' under this rule if it 'is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law,' is undertaken primarily to delay litigation or to harass, or involves 'material factual statements that are false.'" *Versatile Housewares & Gardening Sys., Inc.*, 819 F. Supp. 2d at 242 (quoting N.Y. Comp. Codes R. & Regs. tit. 22, §§ 130–1.1(c)(1)-(3)).

Defendants have not identified any statute, agreement, or court rule that would justify the imposition of attorneys' fees. And while defendants attack plaintiffs' claims on the merits—for example, arguing that Taupita lacks "standing," Counterclaims ¶ 3, to bring this suit, because it did not become a party to the promissory notes or, if it did, because some damages Taupita seeks

accrued before it acquired its interest—defendants do not allege any facts supporting a finding that these claims are so utterly meritless, vexatious, or otherwise frivolous to justify the narrow exception to the American Rule for frivolous litigation.

### 2.     Breach of an Alleged Covenant Not to Sue

In an alternative attempt to sustain their counterclaims, defendants assert that plaintiffs, in "bad faith," have breached a covenant not to sue, and that the damages for such a breach would encompass defendants' litigation fees and expenses. Defendants rely on *Artvale, Inc. v. Rugby Fabrics Corp.*, in which the Second Circuit held that, under some circumstances, New York law permits recovery of litigation costs that result from a breach of a covenant not to sue. 363 F.2d 1002 (2d Cir. 1996); *see* Def. Br. Counterclaims at 12.[4] The path to recovery of litigation expenses identified in *Artvale* and its progeny, however, is unavailable to defendants here for three reasons.

### a.     The Lack of Allegations of Obvious Breach or Bad Faith

First, defendants have not alleged facts supporting a finding that plaintiffs' lawsuit was brought in obvious breach or bad faith, as required for *Artvale* to apply.

*Artvale* held that, absent evidence that the parties intended a covenant not to sue to subject a plaintiff to damages for bringing a lawsuit in good faith, such a covenant "is read as imposing liability only for suits brought in obvious breach or otherwise in bad faith." *Artvale*, 363 F.2d at 1008. In *Artvale*, a plaintiff filed an unsuccessful patent suit in breach of a covenant not to sue. *Id.* at 1004. The Second Circuit affirmed the dismissal of defendant's counterclaim for attorneys' fees deriving from the breach of the covenant. It reasoned that an entitlement to

---

[4] Although "Judge Friendly's opinion in *Artvale* did not state explicitly whether its holding was based on New York or federal common law, . . . subsequent cases implicitly or explicitly have treated *Artvale* as expressing the Second Circuit's view of New York law on this issue." *Kamfar v. New World Rest. Grp., Inc.*, 347 F. Supp. 2d 38, 51 n.64 (S.D.N.Y. 2004).

fees did not generally flow from such a breach, because the "primary function [of a covenant not to sue] is to serve as a shield rather than as a sword." *Id.* at 1008. Accordingly, "to distill [a right to recover damages] out of the usual formal covenant would be going too far"; instead, the Circuit held, "whether a party who has breached a covenant not to sue is liable for litigation expenses inflicted on his adversary" is an inquiry that turns "on what the parties intended by their contract." *Id.*; *see also Kamfar*, 347 F. Supp. 2d at 51 ("A defendant normally may not recover damages—i.e., litigation expenses—for breach of a covenant not to sue unless the parties specifically intended such recovery.").

Here, defendants do not allege any facts suggesting that the covenant at issue was other than "the usual formal covenant." *Id.* They do not argue, let alone support, that the parties to the covenant intended recovery of fees to be the remedy for its breach. On the contrary, there is no contractual language to that effect. Therefore, under *Artvale* and its progeny, defendants may state a claim for attorney's fees only if they sufficiently allege that plaintiffs brought this lawsuit in "obvious breach [of the covenant] or otherwise bad faith." *Id.*; *see Reach Music Pub., Inc. v. Warner/Chappell Music, Inc.*, No. 09 Civ. 5580 (KBF), 2014 WL 5861984, at *8 (S.D.N.Y. Nov. 10, 2014) (citing progeny cases).

Defendants' counterclaims do not adequately so plead. They allege that "Plaintiffs have acted in bad faith in asserting false claims that have had as their purpose avoidance of the contractual limitations of remedy," Counterclaims ¶ 9, and that "Plaintiffs have acted in bad faith in denying the existence of documentation that [disproves their claims]," *id.* ¶ 21. These claims, however, are wholly conclusory. Defendants do not articulate a concrete basis for asserting bad-faith motives on plaintiffs' part in suing in the face of the covenant. Quite the contrary, as reviewed below, plaintiffs have articulated at least two responsible—if not convincing—bases

for contending that their claims are permitted notwithstanding the covenant. *See Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 586 F. Supp. 1286, 1289 (S.D.N.Y. 1984), *aff'd*, 757 F.2d 523 (2d Cir. 1985) (finding suits not in "obvious breach" where plaintiffs have "at least one reasonable good faith argument" for suing in spite of covenant). These are, first, that the covenant not to sue is not enforceable here because their claims here sound in fraud; and second, that defendants lack standing to enforce the covenant because they are not parties nor third-party beneficiaries to the agreement containing it. *See* Pl. Br. Counterclaims at 7–8. At a minimum, these arguments "appear[] plausible to a reasonable person in plaintiffs' position." *Bellefonte*, 586 F. Supp. at 1289; *see also Sauer v. Xerox Corp.*, 5 F. App'x 52, 57 (2d Cir. 2001) (plaintiff's suit was not brought in "bad faith or in direct violation of a covenant not to sue" because it was not fairly characterized as "'entirely without color and [undertaken] for reasons of harassment or delay or for other improper purposes.'" (quoting *Dow Chem. Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 344 (2d Cir. 1986)).[5] The counterclaims for litigation fees and expenses thus cannot be sustained under *Artvale*.

### b. **Plaintiffs' Claims Sound in Fraud**

Second, the Counterclaims are separately barred by the principle that, where plaintiffs' claims sound in fraud, defendants may not invoke a covenant not to sue. "[P]arties cannot use contractual limitation of liability clauses to shield themselves from liability for their own fraudulent conduct." *Turkish v. Kasenetz*, 27 F.3d 23, 27–28 (2d Cir. 1994). The SAC here

---

[5] The absence of non-conclusory allegations establishing bad faith renders unavailable another exception to the American Rule. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013) ("Notwithstanding the American Rule, . . . federal courts have inherent power to award attorney's fees in a narrow set of circumstances, including when a party brings an action in bad faith.").

consists of claim of fraud: Whether cast in terms of fraud, fraud in the inducement, aiding and abetting fraud, or conversion, the SAC's core theory is that Leung, acting through various entities he controls, used knowingly false and deceptive representations to scam plaintiffs out of millions of dollars.[6] Defendants' attempt to invoke the covenant not to sue thus "must fail as a matter of both law and public policy." *Koch v. Greenberg*, No. 07 Civ. 9600 (BSJ) (DCF), 2012 WL 7997484, at *6 (S.D.N.Y. Sept. 30, 2012) (dismissing counterclaim for breach of contract premised on violation of covenant not to sue where counter-defendant alleged fraud).

### c. Defendants May Not Sue to Enforce the NPAs

Third, even assuming such a suit was otherwise permitted, defendants cannot sue for a breach of the covenant not to sue because they lack the required relationship to the NPAs that contain it. Leung and First Toronto are not parties to the NPAs; those agreements are between Plaintiffs and Cathexis. *See* Note Purchase Agreements. Defendants appear to argue that Leung may enforce the covenant because he signed the NPAs on behalf of Cathexis. Def. Br. Counterclaims at 10. But defendants cite no law for that contention, and to the extent that it is based on principles of agency, it is contradicted by the case law. "[T]he terms of a contract may be enforced only by contracting parties or intended third-party beneficiaries of the contract." *Rajamin v. Deutsche Bank Nat. Trust Co.*, 757 F.3d 79, 86 (2d Cir. 2014); *see also Mendel v. Henry Phipps Plaza West Inc.*, 844 N.E.2d 748 (N.Y. 2006). "[A] person making or purporting to make a contract with another as an agent for a disclosed principal does not become a party to

---

[6] Defendants point out that if plaintiffs succeed on their claim of fraud in the inducement, the NPAs would be vitiated and thus would not bar plaintiffs' fraud claims. Def. Br. Counterclaims at 9. But that is beside the point. Under the Second Circuit case law above, a defendant may not use a covenant to sue to pretermit claims of fraud, as defendants attempt here.

the contract, absent an agreement or indication to that effect." *Colonial Sec., Inc. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 461 F. Supp. 1159, 1165 (S.D.N.Y. 1978).

Defendants also claim that Leung and First Toronto are third-party beneficiaries of the NPAs. Counterclaims ¶ 6. That reading of the NPAs is untenable. Paragraph 5(i) of the NPAs, entitled "No Third-Party Beneficiaries," provides: "This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other person." Note Purchase Agreements. "Under New York law, . . . '[w]here a provision exists in an agreement expressly negating an intent to permit enforcement by third parties, . . . that provision is decisive.'" *India.Com, Inc. v. Dalal*, 412 F.3d 315, 321 (2d Cir. 2005) (quoting *Nepco Forged Prods., Inc. v. Consolidated Edison Co. of N.Y., Inc.*, 470 N.Y.S.2d 680, 681 (N.Y App. Div. 2d Dep't 1984)). The negating clause here unambiguously prevents enforcement of the NPA's covenant not-to-sue provision by any person other than the "parties hereto" and their successors and assigns. Leung and First Toronto are not "parties hereto." And Leung's status is as a "director" of Cathexis does not make him a party to the NPA. *See India.Com*, 412 F.3d at 322 ("[T]he mention of [plaintiff] in the contract as a broker entitled to a commission is insufficient to confer third-party status where the parties themselves are explicit that they did not intend to create third-party beneficiaries.").

The Court therefore holds that the NPAs create no enforceable rights in third parties, including defendants Leung and First Toronto.[7] For this reason, too, defendants cannot maintain counterclaims for litigation expenses based on an alleged breach of a covenant not to sue.

---

[7] Because defendants may not sue for violation of the NPAs, defendants' separate argument that plaintiffs have violated their agreement in the NPAs to recover only against the tangible or intangible assets of Cathexis also fails.

For each of the above reasons, the Court therefore grants plaintiffs' motion to dismiss defendants' counterclaims.

**B.    EFG's Motion to Dismiss Defendants' Third-Party Claims**

The Court turns next to third-party defendant EFG's motion to dismiss Leung and First Toronto's ATPC. The APTC brings two third-party claims against EFG. First, it alleges that EFG has breached a note placement agreement (the "Placement Agreement") between EFG and Cathexis. ATPC ¶ 30. Second, it alleges that EFG "induce[d] or caus[ed]" plaintiffs' breach of the NPAs. *Id.* ¶ 44.

As a preliminary matter, the ATPC seeks damages including costs incurred in Leung and First Toronto's defense of this action. ATPC ¶¶ 31–33, 44–45. To the extent that defendants seek to recover litigation expenses from EFG, their third-party claims must be dismissed under the American Rule for much the same reasons reviewed above in connection with defendants' attempt to recover litigation expenses from plaintiffs. Leung and First Toronto have not identified any "agreement between the parties, statute, or court rule" authorizing them to recover litigation expenses from EFG. *Hooper Associates*, 548 N.E.2d at 903.

More broadly, for the following reasons, defendants' two third-party claims against EFG must be dismissed in their entirety.

**1.    Third-Party Claim for Breach of the Placement Agreement**

Leung and First Toronto's first third-party claim is that EFG violated the terms of the Placement Agreement, an agreement with Cathexis under which EFG would act as Cathexis's note placement agent, ATPC ¶¶ 14, 30, by making statements to plaintiffs beyond those EFG was authorized to make.

22

The ATPC defines the Placement Agreement as comprised of terms "set forth in and derived from the series of emails between officers of EFG and Cathexis and the [NPAs] (and other transactional documents) that EFG negotiated with Cathexis and signed on behalf of its clients (or, in some cases, apparently recommended that its clients execute)." *Id.* ¶ 14. As to how EFG breached that alleged agreement, the ATPC alleges that: (1) the Placement Agreement between EFG and Cathexis includes the "express integration and merger clause" found in the NPAs between Plaintiffs and Cathexis, *id.* ¶ 20; (2) that clause "limit[s] the warranties of [the parties to the NPAs] to matters set forth" in the NPAs and the relevant promissory notes, *id.*; and (3) by "communicat[ing] assurances [to plaintiffs on behalf of Leung or Cathexis] . . . at variance with, beyond, or contradictory to those set forth in the NPA," *id.* ¶ 21, EFG breached the broader Placement Agreement which encompasses the NPAs, *id.* ¶ 30; *see also id.* ¶ 17 ("EFG had no contractual right from Cathexis or Sirius to provide its clients with broader, stronger or different assurances as to matters of fact than Cathexis and Sirius themselves were prepared to provide . . . ."). The ATPC contrasts the SAC's allegation that EFG had conveyed representations by Leung to plaintiffs to the effect that the promissory notes were not particularly risky, *id.* ¶¶ 19, 22, with the fact that the parties to the NPA had warranted that the purchasers understood that investment in the promissory notes was speculative and extremely risky. *Id.* ¶ 22. On this basis, the ATPC alleges, "[i]f EFG's clients are found to have relied upon matters of fact, opinion or belief made by EFG that it attributed to Leung, Cathexis or Sirius as their representations or warranties that are not set forth in the [NPAs] as representations and warranties, EFG is liable to Leung in this action for all damages, losses and costs that he may suffer or incur by reason thereof." *Id.* ¶ 26.

Even accepting the facts pled in the ATPC as true, including that the communications of EFG and Cathexis constituted a separate Placement Agreement between them, Leung and First Toronto cannot sue to enforce the NPA provisions incorporated by that alleged agreement. The ATPC notably does not allege that defendants are parties to the Placement Agreement. Leung and First Toronto instead again argue that they can sue as third-party beneficiaries of it, and through that vehicle enforced the NPA's merger-clause terms that ostensibly block Leung's false representations about the promissory notes from being used as a basis for liability.[8] *See* ATPC ¶ 30 (making conclusory allegation that "Leung is a third-party beneficiary of such agreement"). As discussed above, however, the NPAs themselves are not enforceable by Leung or First Toronto. And although the Placement Agreement is, as alleged, a separate contract, Leung and First Toronto do not allege any provision of it that would make them third-party beneficiaries. And the only contractual provision that defendants have alleged that EFG breached are certain warranties found within the NPAs, which by their terms disclaim any third-party beneficiaries.

Under these circumstances, defendants' third-party beneficiary claim cannot stand. The ATPC complaint does not recite any affirmative basis on which to find Leung and First Toronto to be third-party beneficiaries. And the contract provision that Leung and First Toronto seek to enforce is contained in agreements, the NPAs, that squarely negate any third-party beneficiary. In effect, defendants selectively embrace one provision in the NPAs (the merger clause) and

---

[8] Defendants' allegations as to this point with respect to First Toronto are internally inconsistent. The ATPC alleges that "First Toronto is a stranger to the transactions alleged in the Second Amended Complaint." ATPC ¶ 24. However, in their memorandum of law, defendants argue that the "limitation of remedy" clause in the "note placement agreement" was "for the benefit of Leung and First Toronto." Def. Br. Implead at 17. Even giving First Toronto the benefit of the doubt and treating it as having pled in the ATPC what it alleged in its memorandum of law—that it was an intended third-party beneficiary of the EFG—its argument fails as a matter of law, for the reasons that follow.

reject the companion provision (the no third-party beneficiary provision). That bid is incoherent. Under New York law, "a party asserting rights as a third-party beneficiary must establish [*inter alia*] . . . that the contract was intended for its benefit." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 251 (2d Cir. 2006). The ATPC fails to so plead. The Court therefore must dismiss Leung and First Toronto's claim of for breach of contract against EFG.

### 2.       Third-Party Claim for Inducing or Causing Breach of Contract

Leung and First Toronto's second third-party claim against EFG is that EFG induced or caused plaintiffs to sue defendants in violation of Paragraph 5(a) of the NPAs, which contains the covenant not to sue. *See* ATPC ¶ 35. Although styled as "Inducing Breach of Contract," that claim appears to allege claim of tortious interference with contract. For multiple reasons, it, too, is not viable.

"Under New York law, the elements of tortious interference with contract are: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (citing *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)).

Defendants' tortious interference claim fails prongs (1) and (4). First, for the reasons stated above, the ATPC does not adequately allege that Leung or First Toronto are parties to or third-party beneficiaries of the NPAs. "Courts in this Circuit have consistently denied tortious interference with contract claims where the plaintiff was neither a party to, nor an intended third-party beneficiary of, the contract in question." *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 727 (S.D.N.Y. 2014). Second, the APTC does not adequately allege an actual

breach. Plaintiffs cannot have actually breached the covenant not to sue because, for the reasons reviewed above, the covenant cannot lawfully be interpreted to preclude a fraud action against Leung. See *Koch*, 2012 WL 7997484, at *6 ("The Second Circuit has held that it "could not uphold any provision intended to insulate parties from their own fraud."" (quoting *Turkish*, 27 F.3d at 27)). Accordingly, this claim, too, must be dismissed.

C.    **Motion to Strike**

Finally, defendants move to strike plaintiffs' jury demand. Defendants' argument rests on the following provision in the promissory notes pursuant to which plaintiffs invested in the Project:

> Consent to Jurisdiction; Waiver of Jury Trial. The Maker and the Payee hereby consent to the jurisdiction of all courts of the State of New York and the United States District Court for the Southern District of New York, as well as to the jurisdiction of all courts from which an appeal may be taken from such courts, for the purpose of any suit, action, or other proceeding arising out of or with respect to this Note. THE MAKER AND THE PAYEE HEREBY EXPRESSLY WAIVE ANY AND ALL OBJECTIONS WHICH EITHER OF THEM MAY HAVE AS TO VENUE IN ANY OF SUCH COURTS, AND ALSO WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY SUCH SUIT, ACTION, OR PROCEEDING.

Promissory Notes ¶ 5(j).

The Court has reviewed the parties' thoughtful submissions on this issue. The motion presents a substantial question, which turns on whether defendants have the right to enforce this provision, and how the provision applies in the context of this multi-party, multi-claim litigation. The Court's judgment is that this issue is better resolved following discovery and resolution of any motions for summary judgment, at which point it will be more clear which, if any, parties and claims are headed for trial. The Court accordingly denies the motion to strike plaintiffs' jury demand without prejudice to defendants' right to renew that motion following resolution of any motions for summary judgment.

**CONCLUSION**

For the foregoing reasons, the Court (1) grants plaintiffs' motion to dismiss Leung's counterclaims; (2) grants EFG's motions to dismiss Leung's and First Toronto's third-party claims; and (3) denies the motion to strike plaintiffs' jury trial demand without prejudice to defendants' right to renew the motion closer to trial.

The Clerk of Court is thus respectfully directed to terminate the motions pending at Dkts. 72, 87, 89, and 97.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 17, 2017
New York, New York